14-2606 National Labor Relations Board versus FACO Equipment Rental Company Incorporated, oral argument not to exceed 15 minutes per side, Mr. Shard, OBE, please. Good morning, your honors. I'm Donald Shard, appearing on behalf of the respondent, CLACO Equipment Rental Company. I'll be reserving two hours for rebuttal time. We are here to ask the court to deny enforcement of the board's petition to enforce the order issued by the National Labor Relations Board. In the Second Circuit case of NRB versus Porta Systems Corporation, Judge Van Grafflin looked at and reviewed many NRB decisions and concluded in that review that the NRB engaged in results-oriented decision-making, and he said that it should come to an end. Thirty-six years later, 2016, actually 34 years later, 2014, we're here and 36 years later, the board's decisions are still results-oriented. Precedent is irrelevant, and the most important driver in NRB decision-making is, what does the union want? Could we kind of narrow down this global attack and get to this particular case? Your problem is the standard of review that we're required to employ, it seems to me. So you've got to convince us that the board was arbitrary, unreasonable, or abused their discretion. Right, and that's where I'm getting to. To do that, you've got to show us that the findings aren't supported by substantial evidence. Yes. Now, I completely agree with you that there are good arguments on both sides of every one of these tests. I get that. But the fact that the NRB picked the one you don't like doesn't mean that the basis for their decision wasn't supported by substantial evidence, or that they were arbitrary, unreasonable, or an abuse of discretion, even if I don't like their decision. So how do I get around that? I don't believe there are good arguments supporting the NRB decision. If you look at the NRB case law itself, and that's what I was about to get into, we have a situation where there's one employee in Saginaw, Michigan, who's 111 miles away from the only main facility in Melvindale, Michigan. So should distance alone be dispositive? No. But if you look at the factors that the NRB has looked at, when distance is an issue, you see that the NRB is being arbitrary in this decision. Because if you look at the Avis Rent-A-Car decision, in there, the union wanted the second location excluded. And these are the factors that the NRB looked at. The distance. In Avis Rent-A-Car, the distance was 85 miles. In our case, the distance is 111 miles. In the Avis Rent-A-Car decision, the NRB said there was little interchange between the employees at the different locations. If they had ignored Avis, or ignored Clover Fork, you'd have a pretty good argument. But they didn't ignore those. They recognized those decisions. And correctly or incorrectly, they identified factual distinctions between the cases. So where is the error there? They engage in spurious decision-making. In what? Spurious decision-making in identifying those factors. Spurious decision-making. What does that even mean? Because they list the factors, we meet the factors, and they say, we're going to rule against you. We meet all the factors that they've listed. And in the Clover Fork case... Well, they certainly didn't say that you met those factors. No, but it's the unstated issue. They say, here are the factors that are relevant, and we meet those factors to keep these two units separate. And they say, basically, without saying it, that even though you meet those factors, we're going to rule against you because we find community of interest. It's just saying we find community of interest and repeating it many times doesn't make it true. It isn't what they said at all. You're complaining that they've been inconsistent between Avis and this case in the distance. What the board says about Avis is, in Avis, the board determined there was little interchange between the employees at the employers' different locations, and their working conditions were dissimilar. Here in this case, they find, correctly or incorrectly, that there was interchange. The guy at the remote location took his direction from the guy in the main office. And the working conditions were similar. They seemed to do basically the same thing. So I know you can quibble about that, but to say this is spurious... I mean, they told us why they distinguished Avis. Then in Clover Fork, they go on and give us a similar explanation of why they found those cases not to be binding or persuasive. So how is that arbitrary and capricious? Because the facts in our case that they found match up with these two cases and with other cases also. Some do, some don't. The facts that they list in those cases are factors that we have in our case. And when the union says, we don't want these guys in, okay, here's the factors to keep them out. When the union says, we want them in, here's the same factors to keep them in. So if you go back to Avis, as you mentioned about the supervisor, in the Avis case, they said the supervisor visited the employee at the second location once a week. They said that's not enough. In our case, the evidence at the NLRB was that the supervisor showed up one time, or most occasionally. So instead of showing up, he gets his orders from the computer up to, what is it, three times a day? Or he talks to the guy three times a day as opposed to him showing up? Where's the material distinction there? Because the NLRB said the issue is visiting the location, the connection to the location. There's a difference between visiting and connection. In today's world, gee, I mean, nobody talks face-to-face with anybody anymore, even if they're right in the same room. If you're going to have a connection, if you're going to have a community of interest, you need more than just talking. And we have locations that are 111 miles apart. And so the NLRB is saying you need more than just superficial communication. And that's all that's shown in this case. Superficial communication, the issuing of instructions and guidance and that kind of stuff, which is certainly what it seemed to me this record showed. I may have misspoken. I'm talking about the method of the communication, not the content of the communication. So you're elevating form over substance here? No, because the importance is community of interest. And if the supervisor is only on the phone with somebody 111 miles away, that person is not connected to the main location. Just out of curiosity, what difference if they communicate by phone or by computer, does it matter whether they're in the room next door or 500 miles away? What difference does it make? Because the person who is 100 miles away has to have some connection to the unit, has to have some integration to the unit. And there's no integration into this unit. That's the community of interest. So integration has to be face-to-face in the same physical location. There's been no NLRB case that says that you are, that I've seen, that had community of interest when people are just hundreds of miles away, 100 miles away and communicating by phone. And this is not even communicating with the employees three times a day. This is, we're talking right now about the supervisor, which is more tenuous. My question is that in order to do the complicated work, this employee in Saginaw needed the help of the other employees from the main office in Melvindale. Am I right about that, so that there were people who actually went from Melvindale to Saginaw to help him on a periodic basis? I believe in the record there are two times during the entire employment coverage period where someone from Melvindale went and assisted on a project. It happened only two times. You're focused so far in your argument about distance and whether somebody's communication is face-to-face. So you say that it would make a difference legally if, let's assume we have two units that are in buildings and share a common parking lot. So they're right in the same location. But instead of walking across the parking lot, one supervisor walks across the parking lot three times a day. Another supervisor calls across the parking lot three times a day. There would be a difference in outcome because one walks across versus the other? In that situation it would not be because the units are so close and there would probably be other factors. No, no other factors. Other than that, they never talk to each other. They never see each other. If there's no community of interest and the only factor that you're saying is the supervisor gets on the phone and talks to somebody in the second building, I would argue strenuously that there's no community of interest between the two groups. Well, I understand you would argue that, but we're trying to figure out why the weighing of this evidence and the application of their precedent is arbitrary and capricious. Not whether you have a good argument. I think you do. Not whether we might come out differently. Maybe we would. You seem to just be ignoring the deferential standard of review here. I understand that, but I'm saying that there's no evidence in the records to support this. There's not more than a scintilla of evidence in the records that support the NLRB claim. That's my point. My point is that if you look at the case auditors, NLRB case auditors, these are the factors that you look at when you have a distance between two units. And, you know, in some cases they say these are the factors and this is how we come out. And I still think the answer is when the union asks the question, there's a response. And you look at the case law. If I was looking at this as an attorney without my employer's hat on, I'd say in some of these I thought the NLRB was probably wrong in saying that there was no community of interest in the U.S. rent-a-car. When I first read it, I said, of course there's a community of interest. But when you get into it and you say, okay, who's asking the question? There's no community of interest. As you go through the NLRB cases, you go through the Clover Fork case. The distance between the group, the three facilities, was 48 miles in one location, 50 miles in another location. And they said there was a lack of employee interchange between the facilities. We have a lack of employee interchange between the facilities. They said the employees had the same fringe benefits. We don't have the same fringe benefits. But in part you don't have the same fringe benefits because the one in Saginaw is not a member of the union. So he has not been given the benefits that the union demanded in collective bargaining. Am I right? You're right. But still there's a difference in benefits. But isn't that circular? Or arguably heads you in, tails the other guy loses. I don't get that in terms of the difference in benefits. Well, I think there's a difference in benefits and there's a difference in pay. There definitely is a difference in benefits. The difference in pay I'm curious about, what is the pay of the people in Melvindale? The NLRB said that the pay in Melvindale was in the 20s. Like 18 to 24 or something. 16 for the lowest for the new hires and 24, I think, for the mechanics. There's evidence in the record that it was $32. Could you give me that site? Because I looked at the site in your briefs and it didn't seem to correlate, so I was wondering. That's the only site that I have as well in the brief. But it was at least 16 to 24 and this individual was making $18. No insurance and no pension. Yeah, he didn't have the benefits that the union people had. And so I just ask that the court deny enforcement of the order. Thank you, counsel. Good morning, Your Honors. May it please the court, Michael Hickson on behalf of the NLRB. The board properly exercised its broad discretion in determining that the company's Saginaw-based mechanic could appropriately vote to join the existing unit of mechanics and truck drivers based in Melvindale. My opponent made a statement that there's not a scintilla of evidence to support the board's finding. Our position is that the record provides overwhelming evidence, far exceeding the substantial evidence standard necessary to support the board's factual findings, to support those findings. And furthermore, this case is a little bit... Overwhelming? You really want to go there? I really do think it is, Your Honor, but if I could point out a unique circumstance in this case... In light of your precedent, this is overwhelming? I'm not saying whether you win or lose. I'm saying in terms of... Just questioning the hyperbole, that's all. Well taken, Your Honor. I guess that if I could point out another unique circumstance in this case, which is that the court hardly need look at the record because the company, in their opening brief, admitted to virtually all of the board's findings of fact. Its statement of fact in its opening brief virtually verbatim quotes the board's findings of fact. So, you know, there's more than substantial evidence in the record. There's substantial evidence in the record, Your Honor. What about the argument that Avis somehow is in conflict with this case? Right. Well, I think that the board appropriately distinguished Avis by pointing out that in that case it was determined that there was little interchange between the employees and that the working conditions were dissimilar. Whereas in this case, we have a lot of interchange. Well, we have regular interchange, I should say, and we have overwhelmingly similar working conditions. And looking at all of the community interest factors together, which the board has broad discretion in weighing those in making the global analysis and the global determination of whether there is a community of interest, the board's findings are well supported. The company does not dispute, for example, in terms of skills, that Mr. Miller, that's the Saginaw mechanic, that he possesses identical skills to the mechanics that are based in Melvindale who have been in the existing bargaining unit. The company also does not dispute that 95% of Mr. Miller's job duties are duties that are identical to duties performed by the mechanics in the bargaining unit, like going out into the field, to customer job sites, to repair equipment, performing repairs in the shop, preventative maintenance in the shop, checking equipment in and out. 95% of Mr. Miller's duties, it's admitted, are identical to duties performed by the bargaining unit mechanics. Now, he couldn't do the duties in the shop because the shop didn't exist in Saginaw. My understanding is it was a tiny 100-square-foot office versus a 5,000-square-foot office in Melvindale. Am I right on that? Well, there are some type of shop duties that he couldn't do in Saginaw because of the difference in the type of facility. You're correct, Your Honor. But nonetheless, the duties that he performed in the shop are identical to duties that are performed in the shop in Melvindale. He just couldn't do some of them because of the different type of equipment and the different size of the facility. They also have the mechanics that is, they share vastly similar working conditions. They're all paid on an hourly basis. Mr. Miller's wage rate is squarely right there in the middle of the range of the wage rates paid to the Melvindale mechanics. There's some argument that your opponent made that other people got up to $30-some dollars an hour. I didn't see the support for that. Can you clarify? Honestly, Your Honor, I don't see the support for it either. And the record sites in our brief, in the fact section on the wage rates, I don't know which page it is of those sites. There's only a few, I think. But the company's own witness, General Manager Korfels, he testified to the $16 and $24 amounts. So I don't know, honestly, where the other number comes from. And what about your opponent's argument that Mr. Miller didn't receive the kind of health benefits, etc., that the people in Melvindale received? Right. Well, I think, you know, two points, Your Honor. First, that, as the Board pointed out, that simply reflects the fact that Mr. Miller was not in the bargaining unit and the other mechanics were. So they had the benefit of collectively bargained fringe benefits. So that's the first point. And secondly, that hardly, even setting that first point aside, that hardly discounts all of the other overwhelming similarities in working conditions, like the pay rate that I mentioned, like the fact that they work the exact same hours, 7.30 a.m. to 4.00 p.m. each day, with the same opportunity for overtime, like the fact that the company admits that they have similar paid time off benefits in terms of vacation, sick leave, that sort of thing. Again, undisputed, they're covered by the same personnel policies. They're covered by the same employee handbook. The Saginaw mechanic drives the exact same type of company truck as the Melvindale-based mechanics. And then on top of that, you have common supervision, which this Court has recognized also a very important factor in the Community of Interest Test. They've got the same direct supervisor, Service Manager Snyder. Undisputed, he directly supervises the Melvindale mechanics and the Saginaw mechanic. They also, all of the mechanics, share second-level supervision, which this Court has also recognized as a factor, I think in the Byright Lumber case and another case that we cited in our brief, that second-level supervision is also a factor, taken account of in the Community of Interest Analysis. And they share the same direct supervision and the same second-level supervision. What's the second-level supervision here? That would be just the second-level oversight by Mr. Korthels, the General Manager, and then also Mr. Klocko, who's the President. Does the second-level guy ever go to Saginaw? Not that I... I don't know if there's anything in the record. Does he talk to him on the phone? I'm not sure, Your Honor. There's no evidence that... There's no evidence that actually corroborates that while he's technically the second-level supervisor, that he actually does anything with respect to Saginaw. Why would you make that argument? Well, just because it's not disputed and because the Court has recognized... How is it relevant if he never does anything with respect to Saginaw? Well, Your Honor, I don't know that... There's no evidence in the record pointing out, at least that I can recall at this moment, pointing out specific things that he's done in Saginaw. Your Honor is right. But it's just undisputed that he does have the position in the company's hierarchy as the second-level supervisor providing kind of higher-level oversight. And this Court, in the Byright Lumber case and another case that I cannot recall right now that's cited in our brief, has looked at that as a factor. There's also functional integration between the facilities and regular employee contact and interchange. Mr. Snyder, the service manager, in the course of directly supervising all of the mechanics, he assigns them work, coordinates their work, dispatches their work, et cetera, through these electronic logs that cover both of the facilities, that cover, encompass the work of all of the mechanics, the Saginaw-based mechanic and the Melvindale mechanics. I'm curious, in the Melvindale facility, does the supervisor then check the work to see that it's done adequately and accurately? I don't know, Your Honor. We know he doesn't do that in Saginaw, right? Well, we know he doesn't regularly go up there. Yes, that's right, Your Honor. So would it make a difference if he was right there and looking over the shoulder of the people in Melvindale and not there and looking over their shoulder in Saginaw? Or, in other words, the Saginaw employee would work independently and the Melvindale people do not? I understand your point, Your Honor. I mean, I think that is a difference. I don't know that it's shown in the record. I know that my opponent has not raised it to the court. And it also would remain true that, while that would be a difference in the supervision, that Mr. Snyder is nonetheless the only supervisor, the only direct supervisor of Mr. Miller, the Saginaw mechanic. So Colachico hasn't raised that? They haven't relied upon him? No, Your Honor. I don't believe they've raised that, no. Also, the company regularly transfers parts and equipment back and forth between these two facilities. So most of the parts, they're kept in Melvindale because the Saginaw facility is a lot smaller. So the testimony is, the record evidence is, and actually it's, again, undisputed, like virtually all of the factual findings in this case, that most of the parts that Mr. Miller uses when he's doing his job, they come to him from the Melvindale facility. And there's also reasons why equipment gets transferred from the Melvindale facility to Saginaw. For example, if a customer requests a type of equipment from Saginaw that they don't have, maybe they have it in Melvindale, the equipment gets transferred there. Sometimes that equipment, as well as with the parts, it's sometimes brought to, sorry, I'm getting mixed up, to Saginaw by a bargain unit truck driver. So these two, in addition to the mechanics who are in the unit in Melvindale, there's these two truck drivers. Well, it's sometimes a bargaining unit truck driver who is actually taking these parts from the Melvindale facility, or equipment, from the Melvindale facility to Saginaw to Mr. Miller. And when he brings the equipment to Saginaw, sometimes Mr. Miller actually inspects the equipment there at the Saginaw facility before it goes out to the customer. Mr. Miller also has regular phone contact, not just with the supervisor. With the supervisor, it's even more regular, I guess. It's two to three times a day. And then with his fellow mechanics based in Melvindale, he also has regular phone contact. Like if he has a question on how to get a certain job done, he's having difficulty figuring out how to repair a particular type of machinery. The evidence is, and the undisputed, again, finding is, that he will call his colleagues in Melvindale to ask for suggestions and advice and whatnot of how to get the job done. Also, the mechanics in Melvindale, they cover for Mr. Miller whenever he's unavailable. So if he's sick or on leave, or if he's just too busy with other work, Saginaw work, work that's either shop work in Saginaw or work in the field area around Saginaw that would otherwise be done by Mr. Miller is done by these Melvindale mechanics. When he's not available, Mr. Miller, the Saginaw mechanic is not available to do it. Does the record show how often that happens? I don't believe it does, Your Honor. I don't believe it does show exactly how often that happens. No. There also were a few instances in the record where Mr. Miller and Melvindale mechanics actually worked together on the same job, shoulder to shoulder, so to speak. During his training period, the week he spent at the facility in Melvindale, for a couple of those days, he actually went out and worked on customer jobs in the field with a Melvindale mechanic side by side. Then on top of that or after that, subsequent to the training period, there were two specific examples in the record of field repair jobs that required two mechanics where, again, Mr. Miller, the Saginaw mechanic, and one of the Melvindale mechanics worked together on those jobs. I think I covered everything in terms of community of interest, I think. I guess that I would just, well, you know, the board, the standard of review is really important here, and there's multiple levels to it. First, in terms of the board's factual findings, it's substantial evidence, and the law is clear that it doesn't matter if there may be another reasonable interpretation or reading of the evidence that could support a different view, so long as the board's view is supported by substantial evidence, then the factual findings stand. Here, again, you've got another whole level on that because, Your Honor? I guess one of the things that's bothering me a little bit, I'm not sure it would rise to the level of really being able to say that substantial evidence doesn't support the board, but at the hearing, one of the Klotschko people, and I can't remember which one it was, but he was asked specifically with regard to the Saginaw facility, how he would characterize it, and he said, I would first and foremost classify it as a rental facility, then a sales facility, and then a light repair facility. And it doesn't seem to me that Melvindale would be classified that way at all, and clearly Melvindale does the heavy repair stuff, and that's really the bulk of what seemed to me to be going on in Melvindale. I could be wrong about that, but certainly that kind of undermines the theory, at least to me, that there's really not much difference here between these facilities for purposes of doing the community of interest review. Well, I understand your point, Your Honor, and I remember that testimony. I don't think that's the case because it's true that Mr. Miller, the Saginaw mechanic, cannot do the heavy repair work, but that is not the only type of repair work that is done in the shop in Melvindale. And again, it's true, Your Honor, that there's some work done in Melvindale in the shop that Mr. Miller can't do, but it is also true, and in fact undisputed and admitted by the company, that 95% of what Mr. Miller does is identical to things that Melvindale mechanics do. In terms of repair work? In terms of both the field repairs, because two of the mechanics who are based in Melvindale, they normally spend most of their days out in the field. I guess I'm really looking more at the characterization of Saginaw as first a rental facility, then a sales facility, and then a light repair facility, and my recollection of the testimony was, and the evidence was, that Mr. Miller does sales stuff, he does rental stuff, and he does the light repair stuff. I understand, Your Honor, but the focus really isn't on a difference in the facility. The focus is on a difference, or in this case similarity, in the skills and in the duties, and while it's true that there's some heavy repair work that's done in Melvindale that cannot be done in Saginaw. What about sales and rental work? Well, the sales and rental work, what the record shows and what the company admits, is that's 5 or less percent of the Saginaw mechanics' duties. And the sales and rental was done by somebody else? Yeah, there's, excuse me, yes, Your Honor, there's also a permanently placed sales employee. And that person is not trying to become a member of this collective bargaining unit? That's right, Your Honor. That person doesn't do repair work? Correct, Your Honor. That person just does sales, and in fact there's a stipulation in the record that that person and in fact none of the sales employees share any committee of interest with any of the mechanics or bargaining employees and that they're not an issue in this case. I guess that I'm out of town, excuse me, out of town. I am out of town, but I'm also out of time. You are out of time. So respectfully, Your Honors, I just ask that the Court enforce the Board's order in full. Thank you, Counsel. Rebuttal. Thank you, Your Honor. Just a brief point. The General Counsel argues that the Saginaw facility is functionally integrated with Melvindale, and that's one of the main points to support this order. I have to tell you I searched on Westlaw for the definition of functional integration, and unfortunately I could not come up with a good definition. I did find in the Sixth Circuit case of Ryfern, which is cited in both briefs, a statement saying that the two facilities, this was a main nursing home and a new location five miles away was an off-site laundry, that the two facilities were functionally integrated because the laundry facility is an integral element of the nursing home's operation and support. And so my rebuttal point is that there's no evidence that the Saginaw facility was an integral element of the Melvindale facility. It was a satellite. It was not integral. Therefore, the Board's order should be denied enforcement. Thank you. Mr. Sharg, let me turn this around a little bit and get your view on this. Have you found any cases where employees in two different locations are given their work by the same supervisor, and when that work is essentially the same as far as the work that they actually do, where there has not been a continuity of interest? In other words, putting Avis and whatever that other case was, Clove, aside, is there another case that you would rely upon where they haven't found a continuity of interest with the same supervisor, same work? Not that I remember seeing. If I had seen them, I would have cited them in the brief. Good point. I do exhaustive research. So we can assume if it's not in your brief it doesn't exist. It's a pretty good assumption. All right. Thank you. So I'd rely on Avis and the other case. All right. Thank you, Your Honor. Thank you, Counsel. The case will be submitted. There being no further cases to be argued this morning, you may adjourn the court.